No. 81-298

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

JOANIE SWEET,

                Plaintiff and Respondent,

vs.

COLBORN SCHOOL SUPPLY,
BURLINGTON NORTHERN INC.,
& M & L REALTY COMPANY,

                Defendants and Appellants.

---

Appeal from:  District Court of the Thirteenth Judicial District,
             In and for the County of Yellowstone
             Honorable William J. Speare, Judge presiding.

Counsel of Record:

    For Appellants:

        K. Kent Koolen, Billings, Montana
        Anderson, Brown, Gerbase, Cebull & Jones,
         Billings, Montana

    For Respondent:

        Hennessey Law Office, Billings, Montana

---

                Submitted on briefs: November 5, 1981

                    Decided: January 28, 1982

Filed: JAN 28 1982

_Thomas J. Kearney_
_____
                Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the
Court.

Joanie Sweet (Sweet) sued Burlington Northern, Inc.
(BN) and Colborn School Supply and M&L Realty Co. (Colborn)
in Yellowstone County District Court for personal injuries
suffered while crossing the BN track adjacent to the Colborn
building located on BN property.  BN settled by the payment
of $60,000 to Sweet.  BN cross claims against Colborn claiming
indemnification under the BN-Colborn lease.  The District
Court granted summary judgment to Colborn against BN on the
cross claim.  BN appeals.  We affirm the District Court.

The issues are:

(1)  Does the BN-Colborn lease indemnify BN against
damages suffered as a result of the sole negligence of BN?

(2)  Is BN estopped from denying that Colborn at all
times was in full compliance with the BN-Colborn lease?

Sweet claimed that she sustained injury in the course
of her employment as a delivery van driver for United Parcel
Service, while enroute to Colborn's building in Billings,
Montana, for purposes of pick-up and delivery on April 12,
1976.  Sweet claimed that as she was operating her delivery
vehicle upon or across railroad tracks located behind the
building occupied by Colborn, the steering wheel of her
vehicle was caused to suddenly spin and strike her hand,
causing injury.  She claimed that the steering wheel was
caused to spin as the result of ruts, depressions, and
chuckholes in the ground adjacent to the rails over which
she was operating her vehicle.

Colborn is located on the southwest corner of Montana
Avenue and North 27th Street in Billings.  This four story
building occupies railroad right-of-way owned by BN and is

served by a railroad spur track adjacent to the loading dock at the rear of the building. The land occupied by Colborn was leased from the railroad by M&L Realty in 1957. The lease was revised and renewed in 1975. M&L Realty subleased the property to Colborn. Only the property physically occupied by the building and by the loading dock is leased from the railroad. The ground on which the spur track is located is owned by BN and is not covered by any lease agreement.

It was customary for Colborn to receive freight shipments at its loading dock by delivery truck as well as by rail. Such delivery trucks necessarily passed over the rails of the spur track. Colborn and BN were aware of this.

It was an undisputed fact that the strip of land where the accident occurred was under the exclusive control of BN and that BN was the only party with a duty to maintain the area. BN would not allow businesses such as Colborn to conduct or perform separate maintenance procedures in the area where the accident occurred.

Paragraph 5 of the BN-Colborn lease provides:

> "Lessee shall not nor shall Lessee foster, sanction or permit others to operate any equipment, motor driven or otherwise, for the purpose of serving Lessee, upon or across any railroad track located on or adjacent to the demised premises except at established crossings.

> "Lessee agrees to indemnify and save harmless Lessor from all loss, damage, penalties, costs or judgments that may be assessed against or recovered from it on account of or in any manner arising or growing out of a violation of the provisions of this paragraph 5."

The issue is whether the foregoing lease provisions are sufficient to indemnify BN against damages sustained because of the negligence of BN.

On this issue BN maintains that the language of the lease agreement provides that Colborn will indemnify BN for any losses assessed against BN as a result of Colborn violating the terms of the lease. BN claims that there was a violation of paragraph 5 of the lease when Colborn permitted the plaintiff to operate a motor vehicle on tracks other than at an established crossing.

This Court recognizes the validity of a contract provision of indemnity. Lesofski v. Ravalli Co. Elect. Coop. (1968), 151 Mont. 104, 439 P.2d 370; Western Construction Equipment Co. v. Mosby's Inc. (1965), 146 Mont. 313, 406 P.2d 165. However, this Court held that a party cannot be indemnified against its own negligence unless the contract provisions are "clear and unequivocal." In Lesofski a widow of a deceased employee of a highway contractor brought an action against an electric power company for the death of the employee who was electrocuted. The company brought a third-party action against the contractor. The District Court entered a summary judgment for the contractor which the Company appealed. The third-party complaint was based upon an indemnity agreement in a contract between the Company and the State Highway Commission.

The contractor had no contract of any sort with the Company, and there had not been any bargaining by the Company for indemnity for its own negligence. This Court stated that "to contend that we should liberally construe the contract of respondent with the State Highway Commission to include the appellant's negligent acts would in our opinion annul the recognized rule that to indemnify a party against his own negligence it must be expressed in 'clear and unequivocal terms.'" Lesofski, 146 Mont. at 108, 439 P.2d at 372. The

-4-

District Court could not find such clear and unequivocal language in the present case.

BN argues that it had the right to protect itself against an increased risk incurred by permitting Colborn to occupy premises adjacent to the BN tracks. BN also argues the validity of the indemnity clauses which they contend indemnify BN against its own negligence. BN relies upon the Montana case of Ryan Mercantile Company v. Great Northern Railway Company (9th Cir. 1961), 294 F.2d 629, which was an action brought by a railroad's tenant for a judgment declaring the rights of the parties under a lease. The wife of an employee of Ryan was injured while riding in a car when the car was struck by a boxcar being pushed by a Great Northern switch engine. She alleged only negligence of the Great Northern. While finding that the Great Northern should be indemnified for its own negligence, the 9th Circuit Court stated:

> ". . .[I]n order to uphold an indemnification agreement for damages caused by negligent acts of the indemnitee there must be clear and un- equivocal terms. . . An examination of the in- demnity agreement discloses no ambiguity. The phrases used -- 'any and all personal injuries,' 'of every name and nature which may in any manner arise,' 'whether due or not due to the negligence of Great Northern' -- demonstrate that Ryan's indemnity would cover any claim made against Great Northern, . . . and shows that the parties had in mind that the negli- gence of Great Northern would be no bar to Ryan's indemnity obligation." Ryan, 294 F.2d at 633.

The Ryan Mercantile Company lease states that it extends to personal injuries "whether due or not due to the negligence of Great Northern." There is no comparable provision in the BN-Colborn lease. We agree with the conclusion of the District Court that the language from paragraph 5 of the BN- Colborn lease does not provide clear and unequivocal terms

necessary for BN to recover under a theory of indemnification against its own negligence.

Because we recognize the close question in the interpretation of the lease provision, we will consider the next issue which is whether BN is estopped from denying that Colborn was in full compliance with the BN-Colborn lease.

BN claims a violation of the lease agreement's paragraph 5 because Colborn allowed the plaintiff to cross the tracks at an area not "an established crossing." It was undisputed that BN was aware that the tracks were being crossed for deliveries to Colborn. This had been occurring since the original lease in 1957. The undisputed evidence also shows that trucks have been making deliveries across this crossing to the building now occupied by Colborn for more than 60 years on a continuing basis. A new lease was drawn up in 1975 partly because of the construction of a new loading dock. The record shows that BN was aware that Colborn intended to and did use the loading dock, that vehicles could not service the loading dock without crossing the tracks, and that BN maintains the tracks so that vehicles could cross them to service businesses.

Colborn asserted the defense of estoppel, and the District Court held that BN was estopped, as a matter of law, from asserting that a violation of the lease caused plaintiff's injuries. The District Court memorandum opinion stated:

> "BURLINGTON NORTHERN, by its conduct as apparent from the record, has acquiesced in the use of the area where the accident happened as an area for vehicular travel; BURLINGTON NORTHERN has sanctioned such travel and has at least attempted to maintain the area for the specific purpose of vehicular travel to serve such businesses as COLBORN SCHOOL SUPPLY."

In support of the finding of estoppel, the deposition of Blane Pound, BN executive, in part states:

"Q. Well, if you consider what they've been doing for 23 years a violation of the provisions of this lease, Burlington Northern hasn't done anything to prevent them from doing that, have they?

"A. That is correct.

"Q. As a matter of fact, you well know that Burlington Northern has, at least at some time, built that area up there so that vehicles could drive in and out of there.

"A. Correct.

"Q. I see. So what, I guess at the very least Burlington Northern assisted in the violation of the terms of this lease, if that's a violation, huh?

"A. That would appear to be correct.

"Q. And it would also appear that that has been with the approval and blessing of Burlington Northern, wouldn't that be correct?

"A. Yes.

"Q. It's either one of two things. It's either that Burlington Northern assisted Colborn School Supply in violating the terms of the lease -- and I'm referring to full Paragraph 3 under Paragraph 5 -- they've either assisted and approved all these years of that violation or Burlington Northern considers that area back there an established crossing.

(Objection)

"Q. Well, I want you to answer that. It's either one of those two things, isn't it?

"A. Yes, your statement would be correct."

Six essential elements have been held necessary to constitute an equitable estoppel:

"(1) there must be conduct, acts, language, or silence amounting to a representation or a concealment of material facts; (2) these facts must be known to the party estopped at the time of his conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him; (3) the truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time it was acted upon by him; (4) the

-7-

conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under the circumstances that it is both natural and probable that it will be so acted upon; (5) the conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it, and (6) he must in fact act upon it in such a manner as to change his position for the worse."  Smith v. Krutar (1969), 153 Mont. 325, 332, 457 P.2d 459, 463; Hustad v. Reed (1958), 133 Mont. 211, 223, 321 P.2d 1083, 1090; Mundt v. Mallon (1938), 106 Mont. 242, 249-50, 76 P.2d 326, 329.

As to element (1), the actions of the BN in maintaining this particular area as a crossing and allowing vehicles to continuously use the same as a crossing for more than 60 years amounts to a representation that it was a proper crossing for use.  As to element (2), the holding out that this was a proper crossing for usage was clearly known to BN as established by the testimony of the BN executive.  As to element (3), the facts show that Colborn did not know that BN claimed this was not a proper crossing.  As to element (4), the facts show that BN's conduct with regard to the crossing was done with the expectation that Colborn would continue to use the crossing as would its invitees. As to element (5), the facts clearly show that Colborn relied upon such actions of BN and continued to have deliveries made across such crossing to Colborn.  As to element (6), the actions of Colborn, of course, are sufficient to change its position for the worse so that BN could contend a potential breach of the lease.  The record contains clearly sufficient uncontradicted evidence that the six elements of equitable estoppel were present so far as BN is concerned.  As a result, regardless of the contentions on the part of BN as to the technical indemnity provisions of its lease with Colborn, BN is estopped from claiming any right to indemnification.

The District Court properly granted summary judgment to Colborn against BN.  We affirm.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices